UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Criminal No. 23-cr-10271-DJC |
| MATEO VENTURA, | ) ) | |
| Defendant. | ) ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The defendant Mateo Ventura has pled guilty to one count of concealing the financing of terrorism in violation of 18 U.S.C. § 2339C(c)(2)(A). As described in the Pre-Sentence Report ("PSR"), Ventura's actions were designed to finance ISIS's campaign of terror in the Middle East by supporting their purchase of ammunition and explosives. PSR, ¶¶ 32-35. Nor was Ventura content to remain behind a keyboard – instead, he took active steps to travel to the Middle East in furtherance of his plans, which included joining ISIS as a fighter and performing a suicide bombing operation. Such plans were in keeping with the defendant's disturbing obsession with violence and death. Fortunately, Ventura was communicating with an online covert employee of the FBI ("OCE"), not an actual ISIS recruiter.

After his arrest, Ventura showed little self-reflection. In June 2023, he fled from the inpatient mental health facility to which he had been ordered by the court, made his way into a house near the facility, and offered the resident money for transportation. After he was released to his father's home, he violated the conditions of his release by both accessing the internet and sending threatening messages to law enforcement – continuing a pattern of harassment against the FBI that had predated his arrest. To this day, he maintains that the case is simply a government overreaction. PSR, ¶ 104.

The defendant is undoubtedly a young man, and was a young man when he committed the instant offense. He is undoubtedly troubled. But not all young men attempt to finance terrorism and attempt to travel abroad to fight alongside terrorists. Not all young men continue to do so after the FBI has searched their home. Not all young men send threatening messages to law enforcement and violate court orders.

Ventura's actions call for a significant period of incarceration and – more importantly – a significant period of supervised release with real and meaningful conditions. Regardless of the incarceration imposed by the court, he will be a young man in need of significant and prolonged supervision when he is released from custody. For the reasons discussed herein, the government therefore recommends that the defendant be sentenced to the Guideline Sentence Range of 120 months imprisonment, along with 20 years of supervised release with conditions as described in the government's objections to the PSR.

## Sentencing Guidelines Calculation

The government agrees with the calculations outlined in the PSR. The defendant's offense level, including acceptance of responsibility, is 31. PSR, ¶¶ 69-78. Because the offense involved a federal crime of terrorism, the defendant's criminal history category is VI. An offense level of 31 and criminal history category VI would typically result in a guideline sentencing range of 188-235 months. However, a violation of Section 2339C carries a maximum statutory penalty of 120 months. [1] 18 U.S.C. § 2339C(d)(2). As a result, the guideline sentencing range is 120 months.

---

[1] The facts in this case would support a charge under 18 U.S.C. § 2339B(a)(1), which prohibits "knowingly provid[ing] material support or resources to a foreign terrorist organization, or attempt[ing] or conspir[ing] to do so," and carries a maximum term of 20 years. Because the defendant was only charged with violating Section 2339C, however, the potential term of imprisonment is capped below the range of 188-235 months.

2

Offenses involving a federal crime of terrorism include a term of supervised release for any term of years or for life. 18 U.S.C. § 3583(j).

## Applicable Factors

I. <u>Nature and Circumstances of the Offense and Need for Sentence to Reflect Seriousness of the Offense (18 U.S.C. § 3553(a)(1) and (a)(2)(A)).</u>

The defendant's crime was an attempt to fund the murder of other human beings. Few things are more serious. Although Ventura was charged only for conduct that occurred after he turned eighteen, the full spectrum of events dating back to when he was sixteen is useful to understanding his intent.

In August 2021, the defendant contacted an OCE whom he believed to be a member of ISIS, and asked if he could travel to join ISIS as a "mujahideen" (i.e., a fighter). PSR, ¶ 18. He recorded his allegiance to ISIS shortly thereafter. PSR, ¶ 22. He also offered to provide donations to ISIS, with the intent that they would go "straight to mujahideen for help in fight against kuffar," utilizing gift cards in order to mask his identity. PSR, ¶¶ 23-25. A few weeks later, the FBI executed a search warrant at Ventura's residence and warned him about his online activities. PSR, ¶ 26. Nonetheless, he continued to provide donations to ISIS. *Id*.

In February 2022, Ventura purchased a ticket to fly to Cairo with the intent to join ISIS. PSR, ¶ 27. Without his family's knowledge, he traveled to Logan Airport, where he was denied boarding due to his failure to present a negative COVID test. *Id*. He was discovered by a Massachusetts State Trooper and returned home to his father. PSR, ¶ 28. Once again, the FBI interviewed him. Once again, he continued to provide donations to what he thought was ISIS. PSR, ¶ 30.

In January 2023, after he turned eighteen, Ventura again contacted the OCE, stating that he wanted to travel to join ISIS and continue to provide donations to ISIS in the meantime. PSR,

¶ 31. He told the OCE that he wanted to "give his life for jihad," and agreed to provide donations to ISIS for "war on kuffar" and for ISIS to "buy ammunition and explosive." PSR, ¶¶ 32-34. He also informed the OCE that he wanted to fight for ISIS for a couple of months, and then commit a suicide bombing (i.e., an "ishtishadi" operation). PSR, ¶ 35. From January 2023 until shortly before his arrest, Ventura donated $705 to what he thought were ISIS operations to purchase ammunition and explosives in order to commit terrorist acts.

The nature and seriousness of Ventura's crimes demand a lengthy period of incarceration and an extensive period of supervised release. Had Ventura's communications not been with an OCE – had his donations actually gone to ISIS – he would have been financing a terrorist organization bent on death and destruction, *with specific intent that his donations be used to cause the death of others*. The sentence imposed by the Court must reflect the deadly serious nature of Ventura's offense.

II.     Characteristics of the Defendant (18 U.S.C. § 3553(a)(1)).

The defendant has an obsession with violence. As described in the PSR, a review of the defendant's iPhone after his arrest "identified over a hundred violent videos, including videos depicting beheadings, war, torture, terrorist attacks, animal abuse, suicide, white supremacy, pro-Nazi videos, and violence or abuse against women." PSR, ¶ 57. These included:

- 42 videos depicting beheadings or executions, including 20 videos of ISIS beheadings or executions.

- A video with instructions on how to create a fertilizer bomb.

- Videos depicting torture, persons' limbs being cut off or broken with sledgehammers, people being skinned alive, and people having their genitalia fed to or eaten by dogs while alive.

- Videos depicting violence towards women, including murder, rape, torture, and beatings.

- Ten videos depicting animal abuse, including cats lit on fire with a flamethrower, a rat tied to fireworks, explosives placed inside a chicken, and people biting off the heads of living animals.

- Videos that appear to show Ventura taking a video of his computer screen that show information relating to smoke grenades.

- 30 videos depicting war or combat, many focused on dead or decaying corpses, many taken from the Russian-Ukrainian conflict.

- Eleven videos relating to terrorist attacks or mass shootings, including a livestream of the May 14, 2022 mass shooting at Tops Supermarket in Buffalo, NY; a livestream of the March 15, 2019 shooting at a mosque in Christchurch, New Zealand; surveillance video of the March 13, 2019 school shooting in Suzano, Brazil; as well as stabbings and vehicular assaults.

- Videos depicting police shootings.

- A video calling for violence against police officers, which shows clips of officers being attacked, shot, lit on fire, and killed.

- Videos depicting suicide, including people jumping off buildings, people shooting themselves, and self-immolation.

- Videos depicting white supremacy or pro-Nazi propaganda, including lynchings and beatings by the Ku Klux Klan, Nazi executions, and white supremacy groups burning LGBT flags.

*Id*. Law enforcement's review of Ventura's internet activity prior to his arrest also revealed the following:

- *Explosives* – Between November 2022 and January 2023, Ventura searched the internet for the terms "homemade kurdish grenades," "Homemade grenades," "Kurdish," and "suicide bomber."

- *Firearms* – Between November and December 2022, Ventura searched for among other items relating to firearms) "massachusetts gun license references," "can massachusetts deny your gun license for no reason," "buying a gun in new Hampshire," "NH gun laws," "can landowners in new hampshire get a gun permit," and "mass. certified firearms safety course." Ventura also visited pages about whether Massachusetts required gun licenses, about gun safety classes in Massachusetts (including in his hometown of Wakefield, MA), and about gun laws in New Hampshire.

- *Other Violent Items* – On or about January 30, 2023, Ventura searched "How long would it take to bleed out from a severed jugular artery" and "how long does it take to someone to bleed out if they slit their jugular vein."

PSR, ¶ 38. The defendant also sent harassing emails containing violent videos and imagery to an FBI agent:

- On or about February 5, 2023, Ventura sent an email which included thirty-eight pornographic images and videos, eleven images or videos of dead bodies, two videos of people eating live mice, four videos of people being shot point blank, two ISIS propaganda videos, two videos of someone committing suicide by gun, an image of a soldier holding a decapitated head, an image with the words "Kill Someone. It's ok," a video of three children speaking before an explosion occurs, a video of a man being trapped and killed by a conveyor belt, and a video of a man spraying himself with a substance before lighting his beard/face on fire.

- On or about February 5, 2023, Ventura sent approximately three pornographic image or videos, three ISIS propaganda videos, two ISIS beheading videos, an image with the words "Dear federal agents All my posts are serious and I am a threat to society," a video of three children speaking before an explosion occurs, a video of an individual holding a large knife standing next to an individual who is kneeling and wearing a mask, a video of a man being blown up after loading and firing projectiles, a video of planes hitting the Twin Towers on September 11, 2001 followed by multiple clips of Osama Bin Laden, and a video depicting dead bodies.

- On or about February 5, 2023, Ventura sent approximately four pornographic videos, a link to a pornography website, two images of dead bodies, a video depicting dead bodies, a video of a man being shot point blank, two images of men holding assault rifles, a video of soldiers shooting into an oncoming Russian army patrol, and a link to a likely Russian military social media page soliciting donations.

- On or about May 10, 2023, Ventura sent a photograph of a woman covered in blood.

PSR, ¶ 36.

It is undoubtedly this deep-seated and disturbing obsession with violence and death that led to the defendant's actions in this case. Ventura wanted to join an organization that killed other human beings. For example, on January 25, 2023, Ventura told the OCE that he wanted to perform

6

a suicide (i.e., "ishtishadi") attack after he had traveled to join ISIS. PSR, ¶ 35. And he pledged his allegiance to the "Islamic State Caliphate." *Id*. Nor were his efforts limited to ISIS. In April 2023, Ventura contacted an individual who purported to be affiliated with the Wagner Group – a Russian paramilitary or mercenary organization that assisted Russia in its invasion of Ukraine. Ventura told the individual that he wanted to travel to Russia, join Wagner, and fight. PSR, ¶ 52.

Although he did not make an attempt to travel to join the Wagner Group (he was arrested approximately two months after making that communication), Ventura *did* make numerous attempts to travel to join ISIS. The first occurred when he was seventeen years old. As discussed above, on February 1, 2022, Ventura purchased an airline ticket with an ultimate destination of Cairo, Egypt. He departed his house and arrived at Logan Airport, where he approached the ticket counter and attempted to obtain his boarding pass. At that time, he was told that he did not have a negative COVID test and therefore could not board the flight. Rather than return home, Ventura *remained at the airport overnight* with the intent of taking a test when the PCR testing site opened the following morning. Ultimately, a Massachusetts State Trooper found Ventura, identified him as a minor, and returned him home. PSR, ¶¶ 27-28.

Ventura's travel efforts continued after he turned eighteen. On February 28, 2023, Ventura attempted to book a trip to Cairo with a stop in Zurich, but failed to enter a form of payment. PSR ¶ 40. He informed the OCE that his credit card failed. PSR ¶ 41. Then, on April 10, 2023, Ventura purchased a ticket with an ultimate destination of Cairo, departing later that evening, and sent a screenshot to the OCE. PSR, ¶ 45. However, he did not depart his house. He subsequently informed the OCE that his family had not gone to sleep at the right time, preventing him from leaving. PSR, ¶ 51. But he reiterated his desire to commit a suicide attack. *Id*. Ultimately, had Ventura been communicating with an actual ISIS recruiter, rather than with the OCE, it is entirely plausible that

7

Ventura would have succeeded in traveling to the Middle East to join ISIS – and fulfilled his deadly desires.

It is true that the defendant was young when he committed his crimes. But most young persons, even those who are engaged in criminal activities, are not committing federal crimes of terrorism. Though young, Ventura repeatedly ignored efforts by the FBI to dissuade him from his course. PSR, ¶ 26. He made repeated attempts to travel to join ISIS. He sent harassing and threatening messages to law enforcement, while spending his time engaged in the darkest and vilest corners of the internet. PSR, ¶¶ 59-60. After he was arrested, he promptly escaped from a mental health facility and later violated not one but two court orders – that he not use the internet and that he not contact law enforcement. PSR, ¶¶ 61-62. Youth is not an excuse – and Ventura's actions are beyond those of a young man who simply acted intemperately in a single moment. Rather, his actions involved repeated, long-term, calculated efforts to deceive law enforcement and his family in order to support ISIS.

### III.   Protection of the Public (18 U.S.C. § 3553(a)(2)(C))

The defendant may not have committed a violent act, but it was not for lack of trying. As described above, Ventura made repeated attempts to travel to join ISIS in order to commit acts of violence. He took substantial steps towards that end. He did so at a time when the defendant knew he was on the FBI's radar.

He also sent a series of harassing messages to a female FBI agent who was involved in the execution of the August 2021 search warrant and whose email Ventura possessed. In those emails, numbering over four dozen, the defendant sent violent and pornographic images and videos. He sought out the agent's personal information, and registered with a website that provides residential addresses of people across the United States in order to receive "alerts" on that specific FBI agent.

PSR, ¶¶ 36-37. Furthermore, when he fled from inpatient mental health treatment, he persisted in trying to gain entry to a nearby house, even after the resident had slammed the door on him. PSR, ¶ 60.

The facts underscore that Ventura poses a risk to the public at large, and any sentence must take into account those risks.

IV.    Specific Deterrence (18 U.S.C. § 3553(a)(2)(B))

Individuals who commit terrorism-related crimes are more likely to be repeat offenders. *See United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) (*citing United States v. Meskini*, 319 F.3d 33, 92 (2nd Cir. 2003) ("[Terrorists, even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."). This difficulty can already be seen in Ventura's persistent efforts to support and join ISIS. He was warned by the FBI about his online activities on numerous occasions prior to his arrest, in August 2021, March 2022, and September 2022. PSR, ¶ 26. His attempts to travel occurred in January 2022 (as a juvenile), February 2023, and April 2023 – all after the FBI warnings. Furthermore, after his arrest, he was not detained, and attempted to escape from his mental health treatment facility and then repeatedly violated his conditions of release.

Even now, as Ventura sits in detention while awaiting sentencing, he does not appear to recognize the seriousness of his offense. As he told Probation, he is "angry about his current situation" and "believes that the government's decision to prosecute him for the instant offense was 'the government's revenge' and an overreaction to his conduct." PSR, ¶ 104. He went on to say that "being in custody… in federal detention facilities… was 'not the right response' to his

9

conduct." *Id*. In other words, Ventura simply does not understand the magnitude or seriousness of his actions.

Ventura has demonstrated again and again that nothing short of a lengthy period of incarceration followed by long-term supervised release will deter him. Instead of seizing multiple opportunities presented by the FBI to discontinue his conduct, he persisted. He kept his actions hidden from those closest to him. And he has repeatedly stated that it is the government, not himself, who has acted wrongly. The obvious need for specific deterrence supports the government's recommendation in this case.

V.      General Deterrence (18 U.S.C. § 3553(a)(2)(B))

This case carries great value for general deterrence. Unlike isolated or short-lived terrorist activities, the activities that Ventura undertook are more likely to be those undertaken by radicalized individuals in the United States – using the internet to connect with and support other terrorists, and traveling overseas to join a terrorist organization. The length of his prison sentence and of his period of supervised release will send an important message to others about the seriousness with which our Courts regard his conduct.

## The Government's Recommendation

I.      Background

The Supreme Court has directed federal trial courts to initially calculate the appropriate sentencing range under the advisory Sentencing Guidelines. *Gall v. United States*, 552 U.S. 38, 41 (2007). The Sentencing Guidelines, the Supreme Court has acknowledged, are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id*. at 46. Therefore, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial

benchmark" for determining a defendant's sentence. *Id*. at 49. Given the Sentencing Commission's important institutional role and expertise, the Guideline Sentencing Range will often "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *United States v. Kimbrough*, 552 U.S. 85, 89 (2007) (internal quotations omitted); *see also United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008) (holding that "a major derivation from… [the guidelines] must be supported by a more significant justification than a minor one"). Furthermore, appellate courts have frequently criticized significant variances from the Guidelines in terrorism cases. *See, e.g., United States v. Ceasar,* 10 F.4th 66, 82-83 (2nd Cir. 2021) (significant downward variance in terrorism crime based on the personal circumstances of the defendant was unreasonable and not "within the range of permissible decisions"); *United States v. Khan,* 997 F.3d 242, 247-48 (5th Cir. 2021) (18-month sentence for terrorism violation failed to take into account the seriousness of the offense); *United States v. Ressam,* 679 F.3d 1069, 1088 (9th Cir. 2012) (sentence of 22 years was substantively unreasonable where low end of the GSR was 65 years); *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) (sentence of 17 years was substantively unreasonable and reflected a "clear error of judgment" where low end of the GSR was 29 years).

II.   Incarceration

In this case, the GSR is 120 months, which more than adequately reflects a term of incarceration that satisfies Section 3553(a). Indeed, were it not for the ten-year statutory maximum built into Section 2339C for terrorism financing charges – i.e., if the defendant had been convicted under 2339B – his GSR would have been significantly higher than 120 months. Moreover, the seriousness of the defendant's crime, his obsession with violence and the corresponding risk to the public, and the defendant's contempt for law enforcement and for the orders of the court require a sentence within the guideline sentencing range. An individual who attempts to fund the murder of

other human beings, who threatens and harasses law enforcement, who attempts to flee from a court-ordered mental health facility, and who repeatedly violated the orders of the court is not a person who should be granted a downward variance. Quite frankly, nothing about Ventura's conduct suggests that a downward variance is appropriate. The court should therefore impose the guideline range of 120 months.

III. <u>Supervised Release</u>

As important, if not more so, than the term of incarceration is the period of supervised release and the accompanying conditions. The defendant is a young man. Even if the court were to sentence him to 120 months incarceration, he would still be years shy of his thirtieth birthday when released. Given the gravity of Ventura's crimes, his refusal to stop when confronted by law enforcement, his refusal to abide by court orders, his obsession with violence, and his young age upon release, a significant period of supervised release is necessary. A period of 20 years supervised release is necessary to adequately protect the public.[2] Throughout the investigation, and after his arrest, the Defendant has shown repeated contempt for the law, for the court, and for law enforcement. Failing to maintain the Defendant on supervised release for a significant period of time is a recipe for disaster.[3]

---

[2] Such a period of time is in keeping with similarly situated terrorism cases. *See, e.g., United States v. Xie*, D.N.J, 20-cr-871 (sentenced to 20 years' supervised release); *United States v. Elshinawy* (sentenced to 15 years' supervised release); *see also Nine Twin Cities Men Sentenced for Providing Material Support to ISIL*, Nov. 16, 2016 (available at https://www.justice.gov/usao-mn/pr/nine-twin-cities-men-sentenced-providing-material-support-isil) (three men sentenced to lifetime of supervised release for charges stemming from their attempt to travel abroad to join ISIS).

[3] Imposing a lengthy period of supervised release also leaves the Court the option to revisit the length in the future if the defendant is performing well.

The government has also proposed a set of conditions of supervised release. PSR, pp. 44-48. The defendant does not object to *any* of those conditions. PSR, p. 44. But Probation does. Their responses show a fundamental misunderstanding of the nature of the defendant's crimes and the characteristics of the defendant himself. Even if Probation may not want to monitor the defendant's compliance with strict conditions of supervised release, it is necessary to protect the public from future crimes of this defendant. The government addresses each of Probation's responses in turn.

Probation's Response to Objection 1

Probation suggests that the Xie case is an inaccurate comparison because Xie "posted videos and his extremist views on social media, displayed a Hamas flag and handgun, threatened to go on a march and shoot everyone, and made false statements on an application for a security clearance." PSR, p. 44. To the contrary, Ventura's actions are entirely comparable, if not more extreme – he sent numerous violent videos and extremist propaganda in a series of harassing emails to law enforcement, pledged his allegiance to ISIS, and repeatedly violated court orders. Unlike Xie, Ventura did not post to social media – he kept his crimes hidden, indicating a greater need for significant supervision. Ventura did not simply "threaten[]" to shoot people – he took affirmative acts, making numerous attempts to travel overseas to fight for ISIS and commit a suicide bombing, while hiding those efforts from the people around him. The government fully understands the need to impose only conditions "that are individually tailored and reasonably necessary." PSR, p. 44.[4] But, as more fully described below, Probation has failed to suggest a set of conditions that adequately address this individual defendant.

---

[4] The government did not simply cut and paste conditions from the Xie case. Instead, it undertook a review of the conditions imposed there, adopted some verbatim, modified others, and wholly excluded still more. For example, Xie was subject to lie detector tests as a condition of release, a condition the government did not feel was necessary in this case.

Probation's Response to Objection 2

Probation proposes limiting the defendant's restricted affiliations only to "known terrorist organizations." But that restriction is far too narrowly drawn, as it appears to be limited to designated foreign terrorist organizations, or FTOs. Thus, for example, Ventura's communications with individuals affiliated with the Wagner Group, and his attempts to join the Wagner Group in Russia in order to fight in a war, would not run afoul of Probation's proposed condition. Nor would the defendant run afoul of Probation's proposed condition if he became a member of 764, an online violent nihilist extremist group that targets minors by using "threats, blackmail, and manipulation to coerce or extort victims into producing, sharing, or live-streaming acts of self-harm, animal cruelty, sexually explicit acts, and/or suicide," and then circulates the footage "among members of the network to continue to extort victims and exert control over them."[5]

The defendant, as described above, has an obsession with violence and death. While his crime was directed towards ISIS, the record is abundantly clear that he would not shy away from other potentially violent organizations, like Wagner. Thus, the conditions of supervised release must be broad enough to encompass any violent organizations with which the defendant may seek an affinity in the future.

Probation Response to Objection 3

Probation's opposition to computer monitoring, PSR p. 46, is shocking. This condition is tailored directly to the defendant's conduct and is perhaps the most important of all the conditions. The defendant's life prior to his arrest appears to have been lived almost entirely online – left home

---

[5] FBI Public Service Announcement, *Violent Online Networks Target Vulnerable and Underage Populations Across the United States and Around the Globe* (March 6, 2025), available at https://www.ic3.gov/PSA/2025/PSA250306

alone for fourteen hours a day, he went online and onto the dark web in order to seek attention and find something to do. PSR, ¶ 94. He frequented extremist websites, where he swore allegiance to ISIS and attempted to donate money to its cause. He frequented the darkest and most vile corners of the internet, regularly consuming videos of beheadings, rape, torture, animal cruelty, and self-immolation. In other words, Ventura lived in a world of online violence. And, when released to the custody of his father after his arrest, he quickly accessed the internet again and used it to send threatening and harassing messages to law enforcement, in violation of a court order.

In short, there are few defendants that are more in need of regular computer monitoring than Ventura. Without it, the defendant will undoubtedly slip back into the violent online world where he spent so much time prior to his arrest.

<u>Probation Response to Objection 4</u>

As a threshold matter, it is more than appropriate to prohibit the defendant from possessing, viewing, accessing, or otherwise using terroristic material, given his crimes and characteristics, and the government is unclear why Probation would object to such a condition. Furthermore, similarly to Objection 2, the government believes that tailoring the restrictions simply to "terroristic" material is unduly narrow and does not take into account the violent online world where the defendant spent much of his time. If the court were to adopt such a limited condition, the Defendant would be able to possess and view beheading, torture, and rape videos, so long as they were not strictly tied to a terrorist organization.[6] Fundamentally, in order for Ventura to have

---

[6] The government recognizes that the Eighth Circuit rejected similar language in *United States v. Smith*, 145 F.4th 862, 876 (8th Cir. 2025), on the grounds that it did not obtain a "mechanism for obtaining prior approval" and that First Amendment judgments should not be left to Probation. In light of *Smith*, the government is open to a condition containing more specific language that expands beyond simply "terroristic" material and addresses the defendant's desire to frequent the darkest corners of the web.

a successful supervised release which leads him to be a rehabilitated and functional member of society, he must be kept far away from these corners of the internet and from these types of materials.

### Probation Response to Objection 5

Location monitoring is abundantly necessary in this case. As Probation acknowledges, "a location monitoring condition…. can be imposed for purposes of punishment and/or protection of the community." PSR, p. 46. The defendant's actions strongly suggest that the community needs protection. For starters, the defendant made numerous attempts to depart the United States join ISIS overseas in order to commit terrorist acts. He attempted to access the home of a stranger in order to effect his escape from court-ordered mental health treatment. And he sought out the home address and personal information of a female FBI agent who had participated in the search of his residence, while sending her harassing and threatening emails. In other words, Ventura has repeatedly taken active steps towards violent or potentially violent ends. As a result, particularly in the early phase of his supervised release, it is imperative that Ventura be under location restrictions with active monitoring of his compliance.

### Probation Response to Objection 6

The court may order "any condition set forth as a discretionary condition of probation in section 3563(b) and any other condition it considers to be appropriate," so long as it is reasonably related to the 3553(a) factors, involves no greater deprivation of liberty than is reasonably necessary, and is consistent with US Sentencing Commission policy statements. 18 U.S.C. § 3583(d). The government therefore believes that this proposed search condition is authorized by law and the court may impose it.

Probation Response to Objection 7

Probation opposes monitoring the defendant's financial records, which is surprising in a case that involves the financing of terrorism. Probation notes that the defendant's only asset is $2,000 stored in a safe at his house and that Ventura's crimes were not "extensive." Focusing on the scope or size of the financial crime entirely overlooks the seriousness of the crime to which the defendant pled guilty – repeatedly attempting to finance the murder of human beings over a period of months. Moreover, although the total amount of money that Ventura donated as an adult is relatively small ($705), that would comprise approximately 35% of his total present assets.[7] Notably, terrorist attacks can be executed on a relatively small budget – as little as $400-500.[8] It is entirely appropriate and necessary to require that Probation have full knowledge of the defendant's finances and that they be subject to regular monitoring.

Probation Responses to Objections 8 and 9

The government is happy to provide the government with more information on these objections at sidebar during the sentencing hearing.

---

[7] If his juvenile donations were included, it would be over 80%.

[8] World Economic Forum, *How Terrorists Fund Their Attacks – And How to Stop Them*, Nov. 15, 2017, *available at* https://www.weforum.org/stories/2017/11/terror-attacks-are-increasingly-self-funded-how-can-we-stop-them/; National Public Radio, *How Much Does a Terrorist Attack Cost? A Lot Less Than You'd Think*, June 25, 2014, *available at* https://www.npr.org/sections/parallels/2014/06/25/325240653/how-much-does-a-terrorist-attack-cost-a-lot-less-than-you-think.

**Conclusion**

For the reasons set forth above, the government respectfully asks the Court to impose a sentence of 120 months of imprisonment, with twenty years of supervised release with conditions as described in the government's objections in the PSR.

Respectfully submitted,

Date: January 2, 2026

LEAH B. FOLEY
United States Attorney

By:   */s/ Timothy H. Kistner*
Timothy H. Kistner
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

    I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on this date.

Date: January 2, 2026

                                                      */s/ Timothy H. Kistner*
                                                      Timothy H. Kistner
                                                      Assistant U.S. Attorneys